Collin J. Vierra (State Bar No. 322720)
**EIMER STAHL LLP**
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
(408) 889-1668
cvierra@eimerstahl.com

Christopher Bankler (appearance *pro hac vice*)
Devanshi Somaya (appearance *pro hac vice*)
Maggie Burreson (appearance *pro hac vice*)
**JACKSON WALKER LLP**
2323 Ross Ave., Suite 600
Dallas, Texas 75204
(214) 953-6000
cbankler@jw.com
dsomaya@jw.com
mburreson@jw.com

*Attorneys for Petitioner Roku, Inc.*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

ROKU, INC.,

Petitioner,

v.

QUANTA COMPUTER INC.,

Respondent.

Case No. 5:26-cv-05911-VKD

**PETITIONER ROKU, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES**

Date: July 26, 2026
Time: 10:00 a.m.
Room: Courtroom 2 – 5th Floor
Magistrate Judge Virginia K. DeMarchi

## NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION

**TO THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on July 28, 2026 at 10:00 AM or as soon thereafter as the matter may be heard, Petitioner Roku, Inc. will and hereby does move this Court, pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, for an order compelling Respondent Quanta Computer Inc. to arbitrate Petitioner's claims against Quanta, in accordance with the terms of the parties' agreement. Roku's motion is based on this Notice, the accompanying Memorandum of Points and Authorities and supporting declaration, Roku's Petition, documents incorporated by reference or subject to judicial notice, and any other materials presented at the time of hearing.

## STATEMENT OF RELIEF SOUGHT

Petitioner Roku, Inc. seeks an order under Section 4 of the Federal Arbitration Act, 9 U.S.C. § 4, compelling Respondent Quanta Computer Inc. to participate in the arbitration that is pending and currently stayed before the American Arbitration Association (the "AAA Proceeding").

Dated: June 18, 2026

Respectfully submitted,

*/s/ Collin J. Vierra*
Collin J. Vierra (State Bar No. 322720)
**EIMER STAHL LLP**
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
(408) 889-1668
cvierra@eimerstahl.com

Christopher Bankler (appearance *pro hac vice*)
Devanshi Somaya (appearance *pro hac vice*)
Maggie Burreson (appearance *pro hac vice*)
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, Texas 75204
(214) 953-6000

cbankler@jw.com
dsomaya@jw.com
mburreson@jw.com

*Attorneys for Petitioner Roku, Inc.*

# TABLE OF CONTENTS


MEMORANDUM OF POINTS AND AUTHORITIES ........ 1

I. INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 1

I. The parties. ........ 1

II. The MOU and the Development Agreement. ........ 1

III. The parties' development work. ........ 4

IV. Quanta's breach. ........ 5

V. Roku's arbitration demand. ........ 6

ARGUMENT AND AUTHORITIES ........ 6

I. The FAA favors arbitration, and California law governs contract formation. ........ 6

II. The parties agreed to arbitrate because the MOU incorporated the Development Agreement and its arbitration clause, and development work began in March 2024. ........ 7

*A. The Development Agreement, including the arbitration clause, is properly incorporated by reference into the MOU, and the two must be construed together.* ........ 7

*B. The arbitration clause became effective in early March 2024 when "development work" began.* ........ 10

*C. The parties never signed a superseding definitive agreement, so the Development Agreement remains in effect.* ........ 12

III. The Court should not decide secondary issues of arbitrability. ........ 12

CONCLUSION ........ 13

## TABLE OF AUTHORITIES

### CASES

*Ali v. Fed. Bureau of Prisons*,
552 U.S. 214 (2008) ........ 10

*Arthur Andersen LLP v. Carlisle*,
556 U.S. 624 (2009) ........ 7

*Baker v. Aubry*,
265 Cal. Rptr. 381 (Cal. Ct. App. 1989) ........ 8

*Batzel v. Smith*,
351 F.3d 904 (Mem) (9th Cir. 2003) ........ 10

*Boucher v. All. Title Co., Inc.*,
25 Cal. Rptr. 3d 440 (Cal. Ct. App. 2005) ........ 9

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) ........ 12

*Brinkley v. Monterey Fin. Servs., Inc.*,
196 Cal. Rptr. 3d 1 (Cal. Ct. App. 2015) ........ 12

*Copeland v. Baskin Robbins U.S.A.*,
117 Cal. Rptr. 2d 875 (Cal. App. Ct. 2002) ........ 10

*Dean Witter Reynolds, Inc. v. Byrd*,
470 U.S. 213 (1985) ........ 6

*Douglass v. Serenivision, Inc.*,
229 Cal. Rptr. 3d 54 (Cal. Ct. App. 2018) ........ 8

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
97 Cal. Rptr. 3d 856 (Cal. Ct. App. 2009) ........ 8

*First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*,
631 F.3d 1058 (9th Cir. 2011) ........ 10

*Guanacevi Mining Co. v. Comm'r of Internal Revenue*,
127 F.2d 49 (9th Cir. 1942) ........ 12

*Johnson v. Walmart Inc.*,
57 F.4th 677 (9th Cir. 2023) ........ 6

*King v. Larsen Realty, Inc.*,
175 Cal. Rptr. 226 (Cal. Ct. App. 1981) ........ 8

*Marmet Health Care Ctr., Inc. v. Brown*,
565 U.S. 530 (2012) .... 6

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) .... 6

*Mt. Air Enters., LLC v. Sundowner Towers, LLC*,
398 P.3d 556 (Cal. 2017) .... 9

*Newton v. Am. Debt Servs., Inc.*,
854 F. Supp. 2d 712 (N.D. Cal. 2012) .... 9

*Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*,
282 P.3d 1217 (Cal. 2012) .... 7

*Samsung Elecs. Co., Ltd. v. Apple Inc.*,
580 U.S. 53 (2016) .... 12

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) .... 11

*Slaught v. Bencomo Roofing Co.*,
30 Cal. Rptr. 2d 618 (Cal. Ct. App. 1994) .... 8

*Torres v. Auto. Club of So. Cal.*,
937 P.2d 290 (Cal. 1997) .... 11

*Trancas Prop. Owners Ass'n v. City of Malibu*,
72 Cal. Rptr. 2d 131 (Cal. Ct. App. 1998) .... 11

*U.S. ex rel. Butler v. Hughes Helicopters, Inc.*,
71 F.3d 321 (9th Cir. 1995) .... 11

*United States v. Cox*,
963 F.3d 915 (9th Cir. 2020) .... 10

*W. Pueblo Partners, LLC v. Stone Brewing Co., LLC*,
307 Cal. Rptr. 3d 626 (Cal. Ct. App. 2023) .... 7

*Whalen v. NBA Props., Inc.*,
No. 25-cv-01030-CRB, 2025 WL 1948591 (N.D. Cal. July 16, 2025) .... 8

**STATUTES**

35 U.S.C. § 101 .... 12

Cal. Civ. Code § 1638 .... 7

Cal. Civ. Code § 1641 .... 7

Cal. Civ. Code § 1642 .......... 9

**OTHER AUTHORITIES**

AAA Commercial Rule 7(a) .......... 12

The New Shorter Oxford English Dictionary (Thumb Index ed.1993) .......... 10

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Roku and Quanta signed a Memorandum of Understanding ("MOU") in March 2024. That MOU provided that upon commencement of "any development or commercialization work," the Development Agreement attached as Attachment B to the MOU—which included a binding arbitration clause—would govern the parties' relationship, unless and until replaced by an alternative definitive agreement. The question before this Court is narrow: did the parties engage in "development or commercialization work"? They did. Within weeks of signing, Quanta hosted Roku engineers at its Thailand facility for a joint validation build. The parties held joint engineering kickoffs. Quanta accepted confidential design files, bills of materials, and access to Roku's internal systems. Roku, for its part, also committed resources, personnel, and forecasts to the relationship.

That work triggered the provision of the MOU making the Development Agreement, including its arbitration clause, effective and binding on the parties. No definitive agreement was ever executed to replace the Development Agreement. The arbitration clause therefore governs this dispute.

The arbitration clause incorporates the AAA Commercial Rules, which delegate to the arbitrators all gateway questions of scope and enforceability. Thus, this Court should decline to resolve those gateway questions and compel Quanta to arbitrate this dispute.

## FACTUAL BACKGROUND

### I. The parties.

Roku is the leading provider of streaming video distribution services in the United States. Roku designs and manufactures streaming players and televisions and distributes streaming services to consumers through these devices. Olson Decl. ¶ 3. Quanta is a Taiwan-based technology manufacturing company.

### II. The MOU and the Development Agreement.

For years, Roku used Foxconn, a Taiwanese company, to manufacture its technology. Foxconn is the world's largest electronics manufacturer, known for building products for various

companies, including Apple. Olson Decl. ¶ 4. In October 2023, Roku began exploring the possibility of using Quanta as its products manufacturer. *Id.* ¶ 5. Roku released a formal request for quotation (RFQ) to Quanta for Roku's Bayside product on December 19, 2023. *Id.* On January 20, 2024, Roku sent Quanta its annual volume estimates for six player products for which it was seeking a new manufacturer. *Id.* ¶ 6. Specifically, Roku estimated annual volumes of (i) 5,000,000 2K player products, (ii) 3,000,000 Entry 4K player products, (iii) 2,000,000 4K Stick player products, and (iv) 750,000 Ultra player products—10.75 million player products annually. *Id.*

Quanta and Roku negotiated extensively—in person and via Zoom, email, and WeChat—regarding annual volume estimates, pricing, equipment plans, and payment and delivery terms. *Id.* ¶ 7. After months of negotiations, and due to Quanta's favorable pricing, Roku selected Quanta as the manufacturer of its player products. *Id.* ¶ 8. Roku and Quanta incorporated these discussions as terms in the MOU, which became effective March 5, 2024. *See id.*, Ex. 1; *id.* ¶¶ 2, 8.

Roku chose Quanta primarily because of its express commitment to fixed, "not to exceed" manufacturing-value-add ("MVA") pricing, as memorialized in the MOU. *Id.* ¶ 9. Under the MOU, Quanta agreed to calculate prices based on its actual, direct component and logistics costs, with no additional markup except for an agreed amount specified for each product. *Id.*, Ex. 1, Attach. A, ¶ 1. The table below explains the product pricing:

[redacted]

The Product Pricing terms in "Attachment A" to the MOU ("Product Pricing Agreement") bind both parties for three years and set a "not to exceed" price for any product purchases by Roku or its affiliates. *Id.* ¶¶ 9–10.

The MOU also clearly states that upon commencement of "*any* development or commercialization work" between Roku and Quanta, the terms and conditions in "Attachment B: Master Development and Supply Agreement" to the MOU ("Development Agreement") govern, unless and until the parties execute an alternative definitive agreement:

> While each party currently plans to proceed diligently in its efforts to develop the Roku player products, neither Quanta and Roku shall be obligated to enter into a Definitive Agreement, and neither party shall have any liability or responsibility as a result of any failure to do so or any discontinuation or termination of discussions, except to the extent any development or commercialization work begins between Roku and Quanta prior to signing the Definitive Agreement, then the terms and conditions in Attachment B will govern unless and until Roku and Quanta enter into an alternative definitive agreement. This MOU

*Id.*, Ex. 1, p. 2 (emphasis added). In short, the parties contemplated that the Development Agreement would govern their relationship as soon as any development or commercialization work began.

Paragraph 17.5 of the Development Agreement plainly states:

> Except for the right of either Party to apply to a court of competent jurisdiction for a temporary restraining order, a preliminary injunction, or other equitable relief to preserve the status quo or prevent irreparable harm, ***any dispute regarding the interpretation, enforcement, breach, or termination of this Agreement will be settled by binding arbitration in San Francisco County, California under the Rules of the American Arbitration Association*** by three arbitrators appointed in accordance with such rules. Judgment upon the award rendered by the arbitrators may be entered in any court of competent jurisdiction. The prevailing Party will be entitled to receive from the other Party its attorneys' fees and costs incurred in connection with any arbitration or litigation instituted in connection with this Agreement.

*Id.*, Ex. 1, Attach. B, ¶ 17.5 (emphasis added).

**III. The parties' development work.**

Beginning in March 2024, Roku and Quanta both engaged in significant development work for the Roku player products. *Id.* ¶ 10. Below is a non-exhaustive list of the development work performed by both parties to develop the Roku player products:

- Quanta independently purchased and disassembled Roku's existing player products (Rockett, Bailey, Logan, and Benjamin) to analyze materials and assembly processes. This was done to provide Roku with accurate MVA pricing for upcoming products.
- In mid-March 2024, Roku and Quanta held a joint Engineering Kickoff meeting for Roku's Bayside product with key functions represented including engineering program management, electrical engineering, mechanical engineering, radio frequency engineering, software engineering, hardware test, safety, compliance and certification, reliability, operations, procurement, and more.
- On March 21, 2024, Roku and Quanta held a joint kickoff meeting to review the transition plans for Roku's Rockett, Bailey, Logan, and Benjamin products (the "sustaining" products).
- From April 22 to April 26, 2024, the parties conducted the joint validation build (EVT) for Roku's Bayside product, with Roku team members traveling to conduct build activities at Quanta's Thailand facility, including procuring equipment and materials.

- Beginning in February 2024 and continuing through Fall 2024, Roku allocated internal resources and dedicated engineering and operation teams to support Quanta's onboarding and development processes as a manufacturing partner.
- In March and April 2024, Roku provided Quanta with confidential design, test, and production files necessary for product qualification and manufacturing readiness. Quanta was given account access to Roku's design, bug reporting, and document control systems.
- In late April 2024, Roku finalized plans to transition manufacture of sustaining models to Quanta by mid-2024, based on Quanta's validation timing with staggered qualification of products for mass production and full migration of manufacturing by year-end 2024.
- On May 14, 2024, Roku "locked" internal business plans and forecasts based on Quanta's pricing and anticipated production schedules, ceasing negotiations with other manufacturers and committing to Quanta as Roku's primary supplier.

*Id*. ¶ 11(a), (d) - (g), (i) - (j).

On May 9, 2024, Jason Yang, the director of the Sales Department at Quanta, emailed Roku detailing the recent steps Quanta had taken to develop the Roku Player products, i.e., to engage in one or more acts of development work. *Id*. ¶ 12; *id.*, Ex. 2.

**IV. Quanta's breach.**

Several months after the parties began development work, Quanta repudiated its pricing obligations. On May 21, 2024, Quanta's Jason Yang emailed Roku stating that Quanta (1) would not honor the "not to exceed" MVA pricing in the Product Pricing Agreement, and (2) would manufacture Roku products only at increased MVA pricing, thereby repudiating the MOU's binding terms. *Id.* ¶ 12; *id.*, Ex. 2. On May 24, 2024, Yang sent revised MVA pricing to Roku. *Id.* ¶ 13; *id.*, Ex. 3.

Roku relied on the MOU's binding MVA pricing and other material terms in selecting Quanta as its manufacturer. *Id.* ¶ 9. As a direct result of Quanta's breach, Roku had no reasonable alternative but to restart the selection process and engage a different manufacturer, which was an expensive and time-consuming undertaking. *Id.* ¶ 17. The resulting delay disrupted Roku's supply chain and its ability to deliver products to customers on schedule. *Id.* ¶ 18. To mitigate these disruptions, Roku

secured an alternative manufacturer at higher cost, harming its profit margin and jeopardizing its product launch schedules and market commitments. *Id.* ¶ 19.

**V. Roku's arbitration demand.**

In response to Quanta's repudiation, on May 30, 2025, Roku filed a AAA Proceeding asserting a claim for breach of contract and seeking damages of at least $8,425,000. *Id.*, Ex. 4, ¶ 4 n.2. On July 9, 2025, Quanta answered and objected to the panel's jurisdiction to hear the parties' dispute. *Id.*, Intro. At the panel's request, the parties fully briefed the issue of arbitrability. *Id.* On February 5, 2026, the panel held a hearing. *Id.* ¶ 3. On April 2, 2026, the panel stayed the arbitration, concluding that a court must first decide the narrow question of "whether the parties' agreement to arbitrate ever came into effect." *Id.* ¶ 13. The panel explained that this dispute is best "characterized as a dispute over whether an agreement to arbitrate was ever formed—*i.e.*, whether 'development or commercialization work' occurred, thereby bringing Attachment B (the draft Master Development and Supply Agreement) into force along with its arbitration agreement." *Id.* ¶ 14. The panel thus made clear that this court must decide the specific, narrow factual question of whether development work occurred. If the answer to that question is yes, the Development Agreement—including its arbitration clause—came into effect, and the parties are required to arbitrate Roku's breach of contract claim.

## ARGUMENT AND AUTHORITIES

**I. The FAA favors arbitration, and California law governs contract formation.**

The FAA "'reflects an emphatic federal policy in favor of arbitral dispute resolution' that requires courts to 'rigorously enforce agreements to arbitrate.'" *Johnson v. Walmart Inc.*, 57 F.4th 677, 681 (9th Cir. 2023) (quoting *Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 533 (2012) and *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985)). When determining the arbitrability of specific disputes, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Although the parties' incorporation of the AAA Rules delegates questions of scope and enforceability to the arbitrators (*see infra* § III.B.3), the AAA panel held that the Court must determine whether the parties ever formed an agreement to arbitrate, i.e., whether any development or commercialization work began. *See* Olson Decl., Ex. 4, ¶ 13. In determining whether an enforceable arbitration agreement exists, the initial burden is on the party seeking arbitration to prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Pinnacle Museum Tower Ass'n v. Pinnacle Mkt. Dev. (US), LLC*, 282 P.3d 1217, 1224 (Cal. 2012) (compelling arbitration).

"[T]raditional principles" of state contract law determine whether a party is bound by an arbitration agreement. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–32 (2009). Here, the parties agreed to apply California substantive law. Olson Decl., Ex. 1, Attach. B, ¶ 17.4. Under California law, when contract language is clear and explicit, the plain meaning governs, and the court must ascertain the parties' mutual intent based on the language in context. *W. Pueblo Partners, LLC v. Stone Brewing Co., LLC*, 307 Cal. Rptr. 3d 626, 631 (Cal. Ct. App. 2023) (citing Cal. Civ. Code §§ 1638, 1641).

## II. The parties agreed to arbitrate because the MOU incorporated the Development Agreement and its arbitration clause, and development work began in March 2024.

The Court should compel arbitration because the parties agreed to arbitrate any disputes arising out of the MOU. First, the MOU incorporated the Development Agreement, including its arbitration clause, and provided that the Development Agreement would become effective once any development work began. The Development Agreement was expressly identified, attached, and accepted by both parties. Second, development work began in March 2024, meaning the Development Agreement became effective more than a year before Roku commenced arbitration. Third, the parties never entered into an alternative definitive agreement, so the Development Agreement remained effective.

### *A. The Development Agreement, including the arbitration clause, is properly incorporated by reference into the MOU, and the two must be construed together.*

"Under California law, Parties may validly incorporate by reference into their contract the terms of another document." *Slaught v. Bencomo Roofing Co.*, 30 Cal. Rptr. 2d 618, 621 (Cal. Ct. App. 1994) (quoting *Baker v. Aubry*, 265 Cal. Rptr. 381, 383 (Cal. Ct. App. 1989)). Such incorporation is valid when three requirements are met: "(1) the reference is clear and unequivocal, (2) the reference is called to the attention of the other party and he consents thereto, and (3) the terms of the incorporated document are known or easily available to the contracting Parties." *Douglass v. Serenivision, Inc.*, 229 Cal. Rptr. 3d 54, 68 (Cal. Ct. App. 2018) (quoting *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 97 Cal. Rptr. 3d 856, 870 (Cal. Ct. App. 2009)). An arbitration clause in a secondary document can be incorporated by reference. *King v. Larsen Realty, Inc.*, 175 Cal. Rptr. 226, 231 (Cal. Ct. App. 1981) ("A secondary document becomes part of a contract as though recited verbatim when it is incorporated into the contract by reference provided that the terms of the incorporated document are readily available to the other party."). Indeed, arbitration clauses can be incorporated by reference into larger contracts even when they are not formally attached to the contract, but merely accessible via a hyperlink. *Whalen v. NBA Props., Inc.,* No. 25-cv-01030-CRB, 2025 WL 1948591, at *6 (N.D. Cal. July 16, 2025).

Here, as the AAA recognized, the Development Agreement, including its arbitration clause, is plainly incorporated into the MOU by reference. Each of the *Douglass* requirements is met:

First, the reference in the MOU to the Development Agreement is clear and unequivocal. The MOU expressly names "Attachment B: Master Development and Supply Agreement" and states that, upon commencement of development work, "the terms and conditions in Attachment B [the Development Agreement] ***will govern*** unless and until Roku and Quanta enter into an alternative definitive agreement." Olson Decl., Ex. 1, pp. 2, 5 (emphasis added). There is no ambiguity about which document is being incorporated or what role it would play.

Second, the reference to the Development Agreement was called to Quanta's attention and accepted. The MOU was negotiated at arm's length with Quanta's counsel, and the language incorporating the Development Agreement appears merely nine lines above Quanta's signature on the MOU. *Id.*, p. 3. Quanta is also a sophisticated commercial party. Quanta cannot plausibly argue

that it was unaware of the arbitration clause or the conditions under which the Development Agreement would become effective.

Third, the Development Agreement's terms were known and readily available to Quanta. The Development Agreement was not an obscure, difficult-to-access document: it was Attachment B to the MOU itself, physically appended to the document Quanta signed. The record here is thus materially stronger than in *Whalen*, in which this Court enforced an arbitration clause against a consumer that was incorporated into a larger contract only through a hyperlink. *See Whalen*, 2025 WL 1948591, at *6.

The fact that no Quanta representative signed the Development Agreement itself is irrelevant, because it was incorporated into the MOU, which Quanta's representative *did* sign. *See Boucher v. All. Title Co., Inc.*, 25 Cal. Rptr. 3d 440, 444 (Cal. Ct. App. 2005) (non-signatories can be bound by an arbitration clause when it is incorporated by reference into a signed agreement); *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 721 (N.D. Cal. 2012) (finding agreement to arbitrate where plaintiff signed contract that incorporated arbitration clause that was available to her at time of signing).

Independently, California Civil Code § 1642 requires that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." *See also Mt. Air Enters., LLC v. Sundowner Towers, LLC,* 398 P.3d 556, 566 (Cal. 2017) (courts may construe documents together even when not executed contemporaneously and not referring to each other). The MOU and Development Agreement plainly must be "taken together" under section 1642, as they involve the same parties, involve the same subject matter, and were executed as one transaction. Thus, because Quanta agreed to the MOU, it also agreed to the Development Agreement and arbitration clause.

Moreover, Quanta does not dispute that the Development Agreement contains an arbitration clause. Nor does Quanta dispute that the MOU incorporates the Development Agreement and provides that the Development Agreement takes effect upon the commencement of "***any*** development or commercialization work," unless and until replaced by an alternative definitive agreement. Olson

Decl., Ex. 1, p. 2 (emphasis added). This construction makes commercial sense. Although the parties were not initially required to enter into a definitive agreement, once development work began, the parties would need terms and conditions to govern that work. Those terms and conditions were pre-negotiated and set forth in the Development Agreement.

California law recognizes that parties may create enforceable obligations within preliminary agreements even when final terms remain unresolved. A preliminary agreement does not lose its binding force simply because the parties contemplate a later formal contract. *See First Nat'l Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1065–67 (9th Cir. 2011) (holding that an "agreement is not unenforceable merely because it is subject to the approval of a formal contract," and considering extrinsic evidence in holding the preliminary document to be binding); *Copeland v. Baskin Robbins U.S.A.*, 117 Cal. Rptr. 2d 875 (Cal. App. Ct. 2002) (holding that specific commitments in a letter of intent were enforceable under California law, notwithstanding that other terms remained open for negotiation). As in *First National Mortgage* and *Copeland*, the MOU's incorporation of the Development Agreement does not conflict with its reference to an eventual definitive agreement. On the contrary, the MOU was carefully constructed to prescribe exactly when each agreement would take effect.

*B. The arbitration clause became effective in early March 2024 when "development work" began.*

The arbitration clause took full force and effect when the parties began development work in early March 2024. The phrase "any development . . . work" is unambiguous. Development means "adding to or improving." *See Batzel v. Smith*, 351 F.3d 904, 905 (Mem) (9th Cir. 2003) (Gould, J., dissenting). "Development is defined as 'a change in the course of action or events or in conditions; a state of advancement; an addition; an elaboration.'" *Id.* (quoting The New Shorter Oxford English Dictionary 654 (Thumb Index ed.1993)). Meanwhile, "any" here is used in its common sense as an adjective to mean "one or more." *See United States v. Cox*, 963 F.3d 915, 921 (9th Cir. 2020) ("The Supreme Court has observed that, '[r]ead naturally, the word "any" has an expansive meaning, that is, "one or some indiscriminately of whatever kind."'" (quoting *Ali v. Fed. Bureau of Prisons*, 552

U.S. 214, 219 (2008))). In other words, upon *one* act of development work, the Development Agreement would govern.

Contract terms must also be read in context. *Torres v. Auto. Club of So. Cal.,* 937 P.2d 290, 293 (Cal. 1997). In its contractual context, "development work" is work that occurs before full performance of a contract. *See, e.g., Trancas Prop. Owners Ass'n v. City of Malibu,* 72 Cal. Rptr. 2d 131 (Cal. Ct. App. 1998) (in regulatory context, "commencement" of development is broader than commencement of construction); *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999) (arbitration clauses providing for arbitration of all disputes "arising in connection with" the parties' development agreement must be broadly construed as reaching every dispute significantly related to that development agreement). Here, as in *Trancas* and *Simula*, when read in the context of the MOU, "any development" plainly refers to "any" act taken by Roku or Quanta to prepare for the manufacture of Roku player products.

That condition was plainly satisfied because the parties engaged in substantial development work after the MOU was finalized. *See supra*, at 6–8. The parties engaged in joint testing, product procurement, and build activities; they held kickoff meetings to review the transition plans for the Roku sustaining products involving key functions including engineering program management, electrical engineering, mechanical engineering, radio frequency engineering, software engineering, hardware test, safety, compliance and certification, reliability, operations, procurement, and more; Roku provided Quanta with confidential design, test, and production files and gave Quanta account access to Roku's design, bug reporting, and document control systems; and Roku team members even traveled to Quanta's Thailand facility for a joint validation build for a brand-new Roku product, Bayside, which also involved procuring materials and equipment. Olson Decl. ¶ 11. These activities, which were geared toward the advancement of Quanta's manufacturing capabilities for Roku products, are classic examples of "development" work. *See, e.g.*, *U.S. ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 323–24 (9th Cir. 1995) (developing prototypes, integrating, and testing products constitute a "full-scale engineering development effort").

Critically, the MOU did not say that the Development Agreement would take effect only once *manufacturing* activity began. Manufacturing, the "production of articles for use from raw or prepared materials," occurs *after* development activity that lays the groundwork for that manufacturing. *Samsung Elecs. Co., Ltd. v. Apple Inc.*, 580 U.S. 53, 61 (2016) (citing 35 U.S.C. § 101, patent statute); *see also Guanacevi Mining Co. v. Comm'r of Internal Revenue,* 127 F.2d 49, 51 (9th Cir. 1942) (explaining that activities transition "from a development to a producing status" "when the principal activity … becomes the production of developed [products] rather than the development of additional [products]"). Accordingly, although Quanta had not yet begun *manufacturing* Roku's products, the parties' *development* activity was sufficient to trigger the Development Agreement's effectiveness.

*C. The parties never signed a superseding definitive agreement, so the Development Agreement remains in effect.*

Finally, the parties agreed that the Development Agreement would govern "unless and until Roku and Quanta enter into an alternative definitive agreement." Olson Decl., Ex. 1, p. 2. The parties never "enter[ed] into an alternative definitive agreement." *See id.*; *id.* ¶ 16. Thus, the Development Agreement, including its arbitration clause, continues to govern.

**III. The Court should not decide secondary issues of arbitrability.**

The only question for the Court is whether development work began such that the parties' agreement to arbitrate took effect. *Id.*, Ex. 4, ¶ 14. As shown above, it did.

The arbitration agreement incorporates the AAA Commercial Rules, which empower arbitrators "to rule on [their] own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement." AAA Commercial Rule 7(a). The Ninth Circuit has held that when parties incorporate the AAA Rules, incorporation delegates questions of arbitrability to the arbitrator. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *see also Brinkley v. Monterey Fin. Servs., Inc.*, 196 Cal. Rptr. 3d 1, 34–35 (Cal. Ct. App. 2015). The Court should thus decline to address any other arbitrability questions, such as whether the dispute falls within the scope of the arbitration clause or whether the clause is enforceable.

**CONCLUSION**

The AAA panel properly concluded that the parties agreed to the MOU, which incorporated the Development Agreement and its arbitration clause. Olson Decl., Ex. 4, ¶ 14. By the plain text of the MOU, the Development Agreement and its arbitration clause were to become effective once "any development work" began. The AAA panel directed this Court to determine whether any such work began. *Id.* It did. Thus, "an agreement to arbitrate was [] formed," *id.*, and the Court should compel arbitration.

Dated: June 18, 2026

Respectfully submitted,

/s/ Collin J. Vierra
Collin J. Vierra (State Bar No. 322720)
**EIMER STAHL LLP**
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
(408) 889-1668
cvierra@eimerstahl.com

Christopher Bankler (appearance *pro hac vice*)
Devanshi Somaya (appearance *pro hac vice*)
Maggie Burreson (appearance *pro hac vice*)
JACKSON WALKER LLP
2323 Ross Ave., Suite 600
Dallas, Texas 75204
(214) 953-6000
cbankler@jw.com
dsomaya@jw.com
mburreson@jw.com

*Attorneys for Petitioner Roku, Inc.*