**K&L GATES LLP**
10100 Santa Monica Boulevard
Eighth Floor
Los Angeles, CA 90067
Telephone: +1 310 552 5000
Facsimile: +1 310 552 5001

Kevin S. Asfour (SBN 228993)
kevin.asfour@klgates.com
Matthew J. Weldon (*pro hac vice*)
matthew.weldon@klgates.com
Lauren E. Elvick (SBN 348619)
lauren.elvick@klgates.com

Attorneys for Respondent
QUANTA COMPUTER, INC.

UNITED STATES DISTRICT COURT

NORTHER DISTRICT OF CALIFORNIA

ROKU, INC.,

Petitioner,

v.

QUANTA COMPUTER INC.,

Respondent.

Case No. 5:26-cv-5911-PCP

**RESPONDENT QUANTA COMPUTER, INC.'S OPPOSITION TO PETITIONER ROKU, INC.'S MOTION TO COMPEL ARBITRATION**

Date: November 19, 2026
Time: 10:00 AM
Judge: Hon. P. Casey Pitts

Petition Filed: June 16, 2026

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. FACTUAL HISTORY ..... 3

A. Background of the MOU ..... 3

B. Key Provisions of the MOU ..... 4

C. Roku Terminates the MOU ..... 6

D. Roku's Claims for Breach of the MOU ..... 7

E. The Arbitration ..... 8

III. LEGAL STANDARD ..... 9

IV. LEGAL ARGUMENT ..... 9

A. Roku Cannot Establish the Existence of a Valid Agreement to Arbitrate Because the Draft MDSA Never Became Effective ..... 10

1. The Draft MDSA Was Not Incorporated By Reference into the MOU ..... 11

2. No Development Work Began Between Roku and Quanta ..... 13

B. Roku Cannot Establish That An Alleged Breach of the MVA in Attachment A to the MOU Falls Within An Valid Agreement to Arbitrate. ..... 16

V. CONCLUSION ..... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AT & T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986) .......... 9

*Avery v. Integrated Healthcare Holdings, Inc.*,
218 Cal. App. 4th 50 (2013) .......... 10

*Burch v. Premier Homes, LLC*,
199 Cal. App. 4th 730 (2011) .......... 10

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000) .......... 9

*Douglass v. Serenivision, Inc.*,
229 Cal. Rptr. 3d 54 (Cal. Ct. App. 2018) .......... 11

*Gilbert Street Developers, LLC v. La Quinta Homes, LLC*,
174 Cal. App. 4th 1185 (2009) .......... 12

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
561 U.S. 287 (2010) .......... 9

*Johnson v. Walmart Inc.*,
57 F.4th 677 (9th Cir. 2023) .......... 9, 17

*Mendoza v. Trans Valley Transp.*,
75 Cal. App. 5th 748 (2022) .......... 10

*Morgan v. Sundance, Inc.*,
596 U.S. 411 (2022) .......... 9

*Serafin v. Balco Props. Ltd., LLC*,
235 Cal. App. 4th 165 (2015) .......... 10

# OPPOSITION TO MOTION TO COMPEL ARBITRATION

Respondent Quanta Computer Inc. ("**Quanta**" or "**Respondent**") respectfully files this Opposition in response to ("**Roku**" or "**Petitioner**")'s Motion to Compel Arbitration (the "**Motion**").

## I. INTRODUCTION

This dispute arises from alleged breaches of the parties Memorandum of Understanding (the "**MOU**"). (*See* Dkt. 16-2, Ex. 1, (MOU).) The gravamen of Roku's claims in the underlying arbitration that Roku filed is that Quanta failed to honor the manufacturing-value-add ("**MVA**") pricing set forth in Attachment A to the MOU. (*Id.*, MOU at Attachment A.)

According to Roku, after Quanta informed Roku in May 2024 that it could no longer proceed under the manufacturing-value-add ("**MVA**") pricing contemplated by Attachment A to the MOU, Roku terminated the parties' discussions and elected to pursue another supplier. The reason for Quanta's revised pricing proposal was straightforward: although the parties' discussions had originally contemplated substantially greater production volumes, Roku ultimately informed Quanta that it intended to transfer only approximately 1 to 1.5 million units—roughly ten percent of the volume previously discussed. Given Roku's significant reduction in anticipated volume, Quanta could no longer maintain the discounted pricing reflected in Attachment A of the MOU and accordingly provided Roku with revised pricing. Shortly thereafter, on June 13, 2024, Roku informed Quanta that it had "made the tough decision to go [in] another direction," and the parties never finalized a manufacturing agreement. (*See* Ex. A to Declaration of Jason Wang filed concurrently herewith ("**Wang Decl.**").)

Nevertheless, on September 18, 2024, nearly three months after Roku chose to discontinue its discussions with Quanta, it demanded that Quanta not only reimburse US$225,000 in out-of-pocket expenses but also pay more than US$8 million in alleged damages for Quanta's purported breach of the MOU. (*See* Wang Decl., ¶ 11, Ex. B.) These claimed damages arise entirely from Roku's contention that Quanta allegedly failed to honor the pricing set forth in Attachment A to the MOU. Specifically, Roku calculates its damages based on the difference between an alternative

manufacturer's pricing and Quanta's indicative pricing in Attachment A, extrapolated across Roku's product portfolio over a three-year period.

Germane to this Motion and the issues before this Court, Roku claims that Quanta agreed to arbitrate its dispute with Roku. On May 30, 2025, Roku sought to pursue those MOU-based claims by filing a Demand for Arbitration and Statement of Claim based on an arbitration provision contained in an unsigned draft Master Development and Supply Agreement ("**Draft MDSA**"), annexed to the MOU as Attachment B. (*See* Declaration of Matthew Weldon filed concurrently herewith ("**Weldon Decl.**"), ¶ 3, Ex. A; *See* Dkt. 16-2 at p. 6, MOU at Attachment B.) The parties thereafter submitted extensive briefing concerning whether the tribunal had authority to determine inter alia whether the arbitral tribunal has the authority to determine whether the parties had agreed to arbitrate the dispute, and the tribunal conducted a jurisdictional hearing on that threshold issue. (Dkt. 16-2 at p. 73, Ex. 4, ICDR Panel Order ¶ 3.) Ultimately, the tribunal agreed with Quanta that the dispositive question—whether a valid arbitration agreement was ever formed, and therefore, whether the dispute is arbitrable—is a matter for the court to decide. (*Id.* at ¶ 14.) Roku now asks this Court to compel arbitration of those same MOU-based contract claims. (*See* Dkt. 13, Motion.)

Roku's Motion fails at the threshold because the MOU contains no agreement to arbitrate. Instead, Roku seeks to compel arbitration based on an arbitration provision contained in an unsigned Draft MDSA appended to the MOU as Attachment B. (*See* Dkt. 16-2 at p. 6, MOU at Attachment B.) But the Draft MDSA was never executed by either party, and Roku does not claim a breach of the Draft MDSA. Nor do Roku's allegations establish that the parties ever took the steps necessary to make the Draft MDSA operative. Most notably, Roku does not allege that any Statement of Work was ever issued or agreed to under the Draft MDSA.

That omission is dispositive because the Draft MDSA contemplates that development work would proceed through a "Statement of Work." Specifically, it defines "Development Services" as development work performed pursuant to Section 3 of the agreement, which requires Roku to issue, and Quanta to agree to, a Statement of Work. (Dkt. 16-2 at p. 6, MOU at Attachment B ¶¶ 1.14, 1.55, 3.3.) The absence of any Statement of Work is particularly significant because the MOU expressly provides that Attachment B would govern only "to the extent" that "development or

commercialization work begins between Roku and Quanta." (Dkt. 16-2 at p. 3, MOU.) Yet Roku alleges no facts and offers no evidence demonstrating that any such development or commercialization work ever began. Because no Statement of Work was issued, no development work commenced under the Draft MDSA, and the contractual condition precedent to Attachment B's effectiveness was never satisfied.

Roku's Motion therefore depends on the proposition that an arbitration clause contained in an unsigned draft agreement became binding despite the parties' failure to execute that agreement and the parties' failure to engage in "development and commercialization" work to bring the Draft MDSA (or the arbitration agreement contained therein) into force. Arbitration, however, is a matter of consent, and Roku bears the burden of proving the existence of a valid agreement to arbitrate. Here, the record shows no operative Draft MDSA and no manifestation of mutual assent—whether by signature or conduct—to be bound by its terms. Because Roku cannot establish the existence of a valid agreement to arbitrate, or that the parties intended that the arbitration agreement in the Draft MDSA reaches an alleged breach of the MOU, the indispensable foundation of its Motion, the Motion should be denied in its entirety, and the Petition should be dismissed.

## II. FACTUAL HISTORY

### A. Background of the MOU

Beginning in or around May 2023, Roku approached Quanta regarding a potential manufacturing relationship for Roku's player products. (Wang Decl., ¶ 3.) The parties subsequently engaged in discussions concerning a proposed MOU pursuant to which Quanta would serve as a development partner and supplier for Roku's player product segment. (*Id.*) Throughout those discussions, Quanta understood that Roku was looking to transfer all its manufacturing needs for two new products, code-named (1) Bayside and (2) Lakeport, and four existing products, code-named (1) Rockett, (2) Logan, (3) Lockhart, and (4) Benjamin. (*Id.*)

At an early meeting, Roku requested that Quanta prepare estimated MVA pricing based upon a sample that Quanta was to purchase from BestBuy. (*Id.* at ¶ 4.) Later in 2023 and in early 2024, Roku provided a Bill of Materials and anticipated volumes to Quanta and requested that it revise its MVA pricing offer. (*Id.*) Of note, the anticipated volume provided to Quanta in this

context was around 12 million units. (*Id.*) In other words, Roku used this information to prompt Quanta to provide more competitive MVA pricing to Roku, which Quanta did. (*Id.*)

When Roku was satisfied with the MVA pricing, the parties proceeded to enter the MOU. (*Id.* at ¶ 5.) At that time, key commercial terms had not been definitively established, including, without limitation, terms relating to invoicing and credit line requirements; volumes; production lines, including such as assembly and testing processes; capacity; and vendors. (*Id.*)

**B. <u>Key Provisions of the MOU</u>**

The MOU was signed on March 13, 2024, pursuant to which Quanta was to develop and supply Roku-branded streaming player products. (*See* Dkt. 16-2 at p. 2, MOU.) Notably, the MOU specifically states its purpose as follows:

> This MOU is for **discussion purposes only** and is **not intended to constitute a legally binding or enforceable agreement or commitment on either party**, except for the Section entitled 'Legal Terms" below which shall be binding on Roku and Quanta in accordance with its terms.
>
> (*Id.* (emphasis added).)

The parties confirmed that the MOU was not final and only "describes the current understanding of Roku and Quanta regarding a development and commercialization collaboration between Roku and Quanta." (*Id.*) Further, it was noted in the MOU that the parties "plan to negotiate and enter into a Master Development and Supply Agreement in the next sixty days that set forth all of the terms and conditions governing the development and commercialization activities and responsibilities of both parties relating to development, manufacture, and sale of Roku player products," and that an "initial version" of such a "Definitive Agreement" is provided in Attachment B to the MOU. (*Id.*) This 60-day window would have placed the planned time to enter into a definitive agreement by May 12, 2024. (*Id.*)

The "Business Opportunity" portion of the MOU also acknowledges that the arrangement was subject to "mutually agreed specifications and requirements." (*Id.*) Further, the "Next Steps" portion of the MOU states that the parties were to proceed "with negotiation of a Definitive Agreement and the work required to manufacture Roku player products together." (*Id.*)

The Legal Terms section of the MOU commences with the following sentence, also reemphasizing the general nonbinding nature of the MOU:

> By signing this MOU, Quanta and Roku each acknowledge and agree that, except as set forth in this paragraph and the Product Pricing specified in Attachment A, and notwithstanding anything to the contrary, including any subsequent discussions and exchanges between the parties, **no portion of this MOU or Quanta's proposals will be considered binding upon either of Quanta and Roku, and neither party shall have any obligation or responsibility based upon or as a result of this MOU, Quanta's proposal, or the related discussions, unless and until Quanta and Roku both sign a Definitive Agreement**. While each party currently plans to proceed diligently in its efforts to develop the Roku player products, **neither Quanta and Roku shall be obligated to enter into a Definitive Agreement.**
>
> (*Id*. at p. 2 (emphasis added).)

The Legal Terms section then goes on to provide again that there is no obligation to enter into a definitive agreement, but that the terms and conditions of the Draft MDSA may temporarily apply to the degree needed:

> While each party currently plans to proceed diligently in its efforts to develop the Roku player products, **neither Quanta and Roku shall be obligated to enter into a Definitive Agreement, and neither party shall have any liability or responsibility as a result of any failure to do so or any discontinuation or termination of discussions**, except to the extent any development or commercialization work begins between Roku and Quanta prior to signing the Definitive Agreement, then the terms and conditions in Attachment B will govern unless and until Roku and Quanta enter into an alternative definitive agreement.
>
> (*Id*. (emphasis added).)

Thus, although there was generally to be no liability for discontinuing or terminating discussions, it was recognized that if development work commenced, that such work should be governed by the terms and conditions in Attachment B. But that is the outer limit of this provision. This provision cannot be read, as Roku appears to perhaps try to read it, to mean that if development or commercialization work begins, then the parties would actually be obligated to enter into a definitive agreement and would lose their right to terminate the discussions under the MOU. Such a reading is preposterous and would run contrary to the repeated provisions that emphasize that the parties could not be forced into a relationship against their will as the negotiations were continuing.

This provision in the Legal Terms section is not a loophole to force the parties to enter into a definitive agreement for three years, or any amount of time, for any amount of volume. Rather, it simply states that the relevant terms and conditions of the Draft MDSA would apply to any development or commercialization work that had been commenced prior to a definitive agreement being reached, to the extent applicable. There is no other reading of this provision given the parties' unambiguous intent that there was no obligation of either party to enter into a definitive agreement.

The Draft MDSA provides that a "Statement of Work" means:

> a written statement of work that **expressly references this Agreement**, has been mutually agreed upon and signed by the Parties, and identifies the development, manufacturing and other services provided by Supplier, as such statement of work is updated from time to time in accordance with this Agreement.
>
> (*Id.* at p. 8, MOU at Attachment B ¶ 1.55.)

The Draft MDSA provides that "Development Services" means "development work provided to Roku, its Affiliates or their designee pursuant to Section 3 of this Agreement." (*Id.* at ¶ 1.14.) Section 3.2 states: "Supplier's performance of its obligations under this Section 3.2 will be set forth in each applicable **Statement of Work**." (*Id.* at ¶ 3.2.) Section 3 of the Draft MDSA similarly provides that development and any related services will be performed in accordance with a "Statement of Work." (*Id.* at ¶ 3.3.) In other words, in order for development work to be performed, a Statement of Work must be issued by Roku and agreed by Quanta. (*Id.*)

### C. <u>Roku Terminates the MOU</u>

After the MOU was executed, the parties continued discussions and various planning activities during April and early May 2024. (Wang Decl., ¶ 6.) Quanta was, for example, performing testing at potential facilities, and analyzing Roku's products, in order to progress discussions. (*Id.*)

Importantly, no Statement of Work was ever issued by Roku to Quanta. (*Id.* at ¶ 7.) No development or commercialization work was or could have commenced. In order for development or commercialization work to occur under the Draft MDSA, a Statement of Work must be issued.

Further, Roku materially changed the nature of the discussions, which led to the discussions falling apart. (*Id.* at ¶ 8.) At a meeting in May 2024, Roku informed Quanta that instead of around 12 million units in volume, Roku was planning to give Quanta only around 1 to 1.5 million units. (*Id.*) This would not only have a substantial impact on Quanta's approach to the manufacturing of products but also presented an entirely different economic proposition. (*Id.*)

In response to this material change in circumstances, Quanta informed Roku that the MVA pricing would need to be updated, and it provided a revised MVA pricing sheet to Roku on May 24, 2024. (*Id.* at ¶ 9.)

On June 13, 2024, without even suggesting further conversations or discussions, in response, Roku immediately terminated the discussions under the MOU, informing Quanta via email that it had "made the tough decision to go another direction for Bayside, Lakeport and sustaining second source efforts." (*Id.* at ¶ 10, Ex. A).

**D. <u>Roku's Claims for Breach of the MOU</u>**

On September 18, 2024, Roku issued a demand letter (the "**Demand**") to Quanta. (*Id.* at ¶ 11, Ex. B.) Roku claimed in that Demand that Quanta has breached "its contractual commitments" in the MOU. It further stated:

> Roku had selected Quanta as a manufacturer for its Products based upon the terms finalized within the MOU, including binding MVA pricing. Quanta's later decision to unilaterally raise the MVA pricing…materially breached Quanta's commitments in the MOU. Given Quanta's actions, Roku was left with no choice other than to pursue manufacturing of its Products at an alternative manufacturer at a higher price, and Roku is seeking damages from Quanta for the financial harm that Roku has suffered as a result of Quanta's breach.
>
> (*Id.*)

Although Roku loosely referred to Attachment B, it did not allege (nor could it) that any term of the Draft MDSA had been breached:

> Roku and Quanta had conducted prototype build and validation testing for Bayside and sustaining product kickoff and product qualification in addition to engaging in frequent meetings, dialog, emails and planning efforts, which clearly establishes that development and commercialization work had already commenced. Attachment B is a form Master Development and Supply Agreement ("MDSA") that establishes definitive terms for

> development, manufacture, supply, and support of the Products, and Quanta had expressly agreed that these terms would apply until an alternative agreement was reached.
>
> (*Id.*)

Similarly, Roku alleged in its Demand that Quanta breached the "valid and enforceable contract" that they entered into by executing the MOU (and, alternatively, a breach of the implied covenant of good faith and fair dealing by repudiating the "binding MVA pricing commitment set forth in the MOU"). (*Id.*) The so-called pricing "commitment" is contained in Attachment A. (Dkt. 16-2 at pp. 2-4.) Roku did not allege a breach of any term in the Draft MDSA in the Demand. (Wang Decl., ¶ 11, Ex. B.)

**E. <u>The Arbitration</u>**

On May 30, 2025, Roku commenced an arbitration by filing a Demand for Arbitration and Statement of Claim, alleging a breach of contract and breach of the implied covenant of good daith arising from the parties' MOU. (*See* Weldon Decl., ¶ 3, Ex. A.) On July 9, 2025, Quanta filed its Answer, and raised a jurisdictional objection, arguing that the tribunal lacked jurisdiction because the purported arbitration agreement was neither effective nor applicable to the disputes arising under the MOU. (*Id.* at ¶ 4, Ex. B.) On December 12, 2025, the tribunal subsequently ordered further briefing on the jurisdictional issue. (*Id.* at ¶ 5, Ex. C.) In accordance with that schedule, the parties submitted opening briefs and supporting authorities on January 8, 2026, followed by responsive briefs and authorities on January 29, 2026. (*Id.* at Exs. D-H.) The tribunal then heard oral argument at a jurisdictional hearing on February 5, 2026. (Dkt. 16-2, at p. 73, Ex. 4, ICDR Panel Order ¶ 3.)

Following full briefing and argument, the tribunal concluded that the dispute is properly characterized "as a dispute over whether an agreement to arbitrate was ever formed," i.e., whether the arbitration agreement in Attachment B (the draft Master Development and Supply Agreement) came into force. (*Id.* at ¶ 14.) Because the tribunal was bound by federal court decisions, which have consistently held that "whether an arbitration agreement was ever formed is a non-delegable threshold issue reserved for the courts to decide," it declined to resolve that question itself. (*Id.*) Instead, the tribunal sustained Quanta's jurisdictional objection in part and stayed the arbitration

pending judicial determination of whether a valid agreement to arbitrate was ever formed. (*Id.* at ¶ 16.)

## III. <u>LEGAL STANDARD</u>

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal citations omitted); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("Arbitration is strictly a matter of consent, … and thus is a way to resolve … only those disputes … that the parties have agreed to submit to arbitration.") (internal citations omitted).

"[T]he FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (internal citations omitted). Instead, the policy is "merely an acknowledgment" that arbitration agreements are "as enforceable as other contracts, but not more so… Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind." *Id.* (internal citations omitted). Further, where "the existence of an arbitration agreement is at issue … **the presumption in favor of arbitrability does not apply**." *Johnson v. Walmart Inc.*, 57 F.4th 677, 680-681 (9th Cir. 2023) (emphasis added).

The Ninth Circuit uses "general state-law principles of contract interpretation to decide whether a contractual obligation to arbitrate exists." *Id.* at 681. "California courts interpret contracts containing arbitration provisions by application of the plain meaning rule—words of a contract are given their usual and ordinary meaning." *Id.* at 682.

## IV. <u>LEGAL ARGUMENT</u>

Quanta did not consent to arbitration for disputes arising from the MOU. The Court should thus should conclude that no such agreement exists here.

To compel arbitration under federal law, Roku has the burden to establish by a preponderance of the evidence: 1) the existence of a valid agreement to arbitrate between the parties, and 2) the dispute falls within the scope of the parties' agreement to arbitrate. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126 (9th Cir. 2000); *see also Johnson*, 57 F.4th at 680-

681 (9th Cir. 2023). Roku, however, cannot meet its burden because the parties never manifested mutual assent to arbitrate disputes arising from the MOU, either through execution of the MOU or through their conduct. Accordingly, no valid agreement to arbitrate was ever formed and therefore, the Court should deny the Motion.

Furthermore, even if, as Roku contends, an arbitration agreement did form under the Draft MDSA (it did not), Roku's claims against Quanta do not fall within the scope of the arbitration agreement under the Draft MDSA. For this independent reason, too, the Court should deny the Motion.

### A. Roku Cannot Establish the Existence of a Valid Agreement to Arbitrate Because the Draft MDSA Never Became Effective

It is undisputed that the MOU contains no arbitration agreement. Further, the arbitration clause in the Draft MDSA does not constitute a valid arbitration agreement between the parties.

As with any other contract, "[m]utual assent is required for there to be an enforceable agreement to arbitrate disputes." *Burch v. Premier Homes, LLC*, 199 Cal. App. 4th 730, 745-46 (2011). Mutual assent "is determined under an objective standard applied to the outward manifestations of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Serafin v. Balco Props. Ltd., LLC*, 235 Cal. App. 4th 165, 173 (2015). Parties can expressly agree to arbitrate by signing an agreement or agree to arbitrate impliedly by conduct. *See Mendoza v. Trans Valley Transp.*, 75 Cal. App. 5th 748, 777 (2022). But importantly, "the parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.' If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." *Avery v. Integrated Healthcare Holdings, Inc.*, 218 Cal. App. 4th 50, 67 (2013) (holding the plaintiff did not assent to an arbitration agreement) (citing *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998)). Here, as described below, there is no mutual assent.

Preliminarily, as noted, Attachment B is in a draft form and was *not signed* by either party. The MOU explicitly refers to Attachment B as an "initial version" of the Master Development and Supply Agreement and states that "Quanta and Roku *plan to negotiate* and enter into a Master

Development and Supply Agreement." (Dkt. 16-2. at p. 2, Ex. 1, MOU, at 1.) In other words, none of the terms in Attachment B were finalized or agreed upon. The parties were free to negotiate for any final terms in a definitive agreement, including any type of dispute resolution clause.

Thus, Roku must rely on the Legal Terms section of the MOU, which states:

> While each party currently plans to proceed diligently in its efforts to develop the Roku player products, neither Quanta and Roku shall be obligated to enter into a Definitive Agreement, and neither party shall have any liability or responsibility as a result of any failure to do so or any discontinuation or termination of discussions, except to the extent any development or commercialization work begins between Roku and Quanta prior to signing the Definitive Agreement, then the terms and conditions in Attachment B will govern unless and until Roku and Quanta enter into an alternative definitive agreement.
>
> (*Id.*)

The caveat to the disclaimer of "any liability or responsibility as a result of any failure to do so [enter into a definitive agreement] or any discontinuation or termination of discussions" is limited to the scope of that disclaimer. The caveat thus can only apply "to the extent" of any development or commercial work that has been performed and the cessation of discussions under the MOU. It does not operate to force a party into a definitive agreement, which would defy the very purpose of the MOU. And there is nothing in the language of the MOU or Draft MDSA to suggest that if development or commercialization work took place, and there was a cessation of discussions under the MOU, that the parties would arbitrate any disputes for breach of the MOU or otherwise.

**1. The Draft MDSA Was Not Incorporated By Reference into the MOU**

Roku contends that the Draft MDSA's arbitration agreement was incorporated by reference into the MOU under *Douglass v. Serenivision, Inc.*, 229 Cal. Rptr. 3d 54, 68 (Cal. Ct. App. 2018). Specifically, Roku contends that the incorporation was "clear and unequivocal" because it stated that "the terms and conditions in Attachment B will govern," upon commencement of development work, and that this incorporation was accepted by Quanta because its representative signed the MOU. (Dkt. 16, Mot. at 8:3-9:8.)

The MOU does not state that Attachment B is incorporated into, or becomes part of, the MOU. Instead, it provides only that the "terms and conditions in Attachment B will govern" "*to the extent* any development or commercialization work begins between Roku and Quanta." (Dkt. 16-2. at p. 2, Ex. 1, MOU, at 1 (emphasis added).) That language does not incorporate the Draft MDSA into the MOU; rather, it contemplates the potential future application of a separate agreement upon the occurrence of specified conditions. Indeed, "[i]ncorporating the *possibility* of a *future* rule by reference simply doesn't even meet the basic requirements for a valid incorporation by reference under simple state contract law." *Gilbert Street Developers, LLC v. La Quinta Homes, LLC*, 174 Cal. App. 4th 1185, 1194 (2009) (emphasis in original). "Most basically, what is being incorporated must actually exist at the time of the incorporation, so the parties can know exactly what they are incorporating." *Id.* In other words, the MOU treats Attachment B as a distinct agreement that may become operative in the future, not as terms incorporated into the MOU at execution.

Moreover, any argument that there was a "clear and unequivocal" incorporation by reference, and that Quanta "accepted," and consented to the Draft MDSA would contravene the express terms of the MOU. The MOU plainly states that "[a]fter signing this MOU, Quanta and Roku **plan** to negotiate and enter into a [MDSA]," and describes Attachment B as merely an "initial version" of that contemplated agreement. (Dkt. 16-2, p. 2 (emphasis added).) The Legal Term Section also expressly negate any notion that the draft MDSA in Attachment is operative and incorporated into the MOU:

> [N]o portion of this MOU or Quanta's proposals will be considered binding upon either of Quanta and Roku, and neither party shall have any obligation or responsibility based upon or as a result of this MOU, Quanta's proposal, or the related discussions, **unless and until Quanta and Roku both sign a Definitive Agreement… [N]either Quanta and Roku shall be obligated to enter into a Definitive Agreement.**
>
> (*Id.* (emphasis added).)

The MOU thus makes only one thing "clear and unequivocal": Attachment B was a draft of a future agreement the parties contemplated—but were not obligated—to execute. It was not an

operative agreement the parties had already accepted or incorporated into the MOU. Roku's incorporation-by-reference arguments cannot be reconciled with this explicit language.

### 2. No Development Work Began Between Roku and Quanta

Roku likewise cannot establish the factual predicate necessary to invoke Attachment B in the first place because no development work began between Roku and Quanta prior to signing a definitive agreement. In support of Roku's Motion, Roku filed the Declaration of Daniel R. Olson contending the following "development work" occurred:

a. Quanta independently purchased and disassembled Roku's existing player products (Rockett, Bailey, Logan, and Benjamin) to analyze materials and assembly processes. This was done to provide Roku with accurate manufacturing value add (MVA) pricing for upcoming products.
b. In October 2023, Roku conducted an on-site audit of Quanta's Thailand manufacturing facility to ensure capabilities met Roku's requirements.
c. Roku shared detailed bill of materials for the player products with Quanta. The Parties also reviewed process flow assumptions, test station coverage, cycle times, and manufacturing direct labor estimates. In January 2024, Roku provided Quanta with annual volume estimates for each player product totaling 10.75 million per year.
d. Beginning in February 2024 Roku allocated internal resources and dedicated engineering & operation teams to support Quanta's onboarding and development processes as a manufacturing partner.
e. In mid-March 2024, Roku and Quanta held a joint Engineering Kickoff meeting for Roku's Bayside product with key functions including engineering program management, electrical engineering, mechanical engineering, radio frequency engineering, software engineering, hardware test, safety, compliance and certification, reliability, operations, procurement and more being represented.
f. On March 21, 2024, Roku and Quanta held a joint kickoff meeting to review the transition plans for Roku's sustaining products Rockett, Bailey, Logan, and Benjamin.
g. In March and April 2024, Roku provided Quanta with confidential design, test, and production files necessary for product qualification and manufacturing readiness. Quanta was given account access to Roku's design, bug reporting and document control systems (Propel/Jira).
h. From April 22 to April 26, 2024, the Parties conducted the joint validation build (EVT) for Roku's Bayside product, with Roku team members traveling to conduct build activities at Quanta's Thailand facility, including procuring equipment and materials.
i. In late April, Roku finalized plans to transition sustaining models to Quanta by mid-2024, based on Quanta's validation timing with staggered qualification of products for mass production and full migration of manufacturing by year-end 2024.

j. On May 14, 2024, Roku locked internal business plans and forecasts based on Quanta's pricing and anticipated production schedules, ceasing negotiations with other manufacturers and committing to Quanta as the primary supplier.

(Dkt. 16-1, pp. 3-5.)

Many of these examples consisted of activities performed by Roku itself, including "conduct[ing] an on-site audit of Quanta's Thailand manufacturing facility" **six months prior** to the MOU being signed on March 13, 2024, sharing bill of materials information with Quanta, "allocate[ing] internal resources" to support the discussions (again prior to the MOU even being signed), and "finaliz[ing] plans" and "forecasts." (*See* Dkt. 16-1 at p. 4, Olson Decl. ¶ 10.)

The suggestion that these activities constitute "development" under the Draft MDSA is unsupported by the agreement's terms. Roku was not responsible for performing Development Services under the contemplated relationship, and the activities it identifies bear no resemblance to the development work contemplated by the Draft MDSA. (*See* Dkt. 16-2 at p. 8, Attachment B at ¶ 1.14 (defining "Development Services" as "the development work provided to Roku," by Quanta under Section 3, ¶ 3.3 (stating "Development," is a Product delivered by Quanta to Roku "in accordance with the applicable Statement of Work"), ¶ 5.1 (Quanta will "manufacture, assemble, and supply … Products conforming to the Specifications and ordered pursuant to Orders placed by Roku.") Roku's attempt to characterize its own activities as "development" only underscores the lack of any evidence that Development Services ever commenced.

Further undermining Roku's position, five of its ten purported examples of "development work" predate execution of the MOU itself. (*See* Dkt. 16-1 at p. 4, Olson Decl. ¶ 10.) In other words, Roku apparently argues that on the date the MOU was signed (even though it contains numerous statements that the parties were not obligated to enter into a definitive agreement), Attachment B immediately became effective, and a definitive agreement was forced on the parties. This not only defies logic, but it is also plainly contradicted by the MOU (which states that there was no obligation for the parties to enter a Definitive Agreement) and by Roku's conduct. If Roku really believed that when the MOU was signed a definitive agreement became effective, when Quanta gave notice that the MVA pricing would need to increase given that Roku was reducing the

volumes, Roku would never simply respond that it was taking its business in another direction (as it did). Instead, Roku would have invoked any number of terms of the Draft MDSA, such as Section 16.2 (Termination for Breach), which would involve a notice of breach from the terminating Party, and an opportunity to cure. Roku did not invoke any such provisions because it knew that no development work occurred, it knew the parties had not entered into any definitive agreement, and it knew that the Draft MDSA was not in force. It understood, as Quanta did, that the negotiations simply broke down when Roku walked away.

Faced with this reality, Roku essentially admits that all of its alleged "development" activities under the MOU were only just "discussions." In order to get around this clear fact, Roku strangely argues that discussions *themselves* actually qualify as development. (*See* Dkt. 16-1 at p. 4, Olson Decl. ¶ 10(f).) That is also not a serious argument. Roku cannot deny and does not deny that a Statement of Work is required in order for development work to occur. (Dkt. 16-2 at p. 8, Attachment B ¶¶ 1.14, 1.55, 3.2, 3.3.)

Nor did Roku issue any document, directive, or communication purporting to invoke Attachment B or govern the parties' relationship pursuant to its terms. Rather, Quanta merely provided an MVA pricing proposal, and the parties continued negotiating the terms of a potential future legal and commercial relationship. (Wang Decl., ¶¶ 4-9.) Those discussions included technical, manufacturing, commercial, and planning issues that would need to be resolved before the parties could enter into a definitive agreement. (*Id.*) Ultimately, Roku terminated those discussions and elected to pursue another supplier. (*Id.* at ¶ 10, Ex. A.) Notably, Roku never purported to "terminate" the Draft MDSA because the Draft MDSA was never operative in the first place. The fact that Quanta may have been using prototypes to test its manufacturing processes, and was communicating with potential vendors, to be ready to commence activities under a definitive agreement, does not mean that the parties had begun working under the terms and conditions set out in Attachment B on the proposed manufacturing arrangement. Indeed, it would make no sense since material terms were still undetermined.

In short, Roku cannot satisfy its burden of proving that an agreement to arbitrate was ever formed. The Draft MDSA was never executed, and the parties never manifested—either expressly

or through their conduct—an intent to be bound by its terms. Nor can Roku establish that the condition precedent to Attachment B ever occurred because no Statement of Work was ever issued. Absent an operative MDSA, there was no agreement to arbitrate. Because Roku cannot establish the existence of a valid arbitration agreement, the Motion to Compel Arbitration must be denied.

### B. **Roku Cannot Establish That An Alleged Breach of the MVA in Attachment A to the MOU Falls Within An Valid Agreement to Arbitrate.**

Even if Roku could establish a valid arbitration agreement existed, Roku's Motion independently fails because the Draft MDSA's arbitration clause, even if valid, does not reach Roku's claims against Quanta, which arise exclusively from an alleged breach of the MOU. The arbitration clause Roku invokes therefore does not cover the dispute Roku has brought.

The MOU states "the terms and conditions in Attachment B will govern" only "**to the extent** any development or commercialization work begins between Roku and Quanta prior to signing the Definitive Agreement." (Dkt. 16-2 at p. 3, Exhibit 1 (emphasis added).) Nothing in that limited provision suggests that Attachment B's terms—including its arbitration clause—would govern the *entire* MOU, or disputes *unconnected* to such development work, simply because development activity occurred but the MDSA was never entered into. Thus, even if development or commercialization work began, the Draft MDSA's arbitration clause would only apply "to the extent" of such work. Roku's claims, by contrast, arise exclusively from Quanta's alleged breach of the MVA pricing in Attachment A to the MOU, a provision that has nothing to do with development work or the Draft MDSA. (Weldon Decl., ¶ 3, Ex. A.)

The Draft MDSA's own arbitration clause confirms the same narrow scope: Section 17.5 provides that "any dispute regarding the interpretation, enforcement, breach, or termination of this Agreement will be settled by binding arbitration." (Dkt. 16-2 at p. 48, Attachment B ¶ 17.5). "Agreement" is defined to mean "[t]his Master Development and Supply Agreement." (*Id.* at p. 7). By its own terms, then, the arbitration clause in the Draft MDSA only reaches disputes about the Draft MDSA—not disputes about the MOU or its Attachment A.

Roku's claims thus fall squarely outside the arbitration clause's scope. The gravamen of Roku's dispute is that Quanta did not honor the MVA pricing in Attachment A to the MOU.

(Weldon Decl., ¶ 3, Ex. A.) This term is part of the MOU and not included in the Draft MDSA, and is independent of the development work that Roku contends occurred. Thus, even if commercialization or development work began, Roku's claims do not arise from any such commercialization or development work or the Draft MDSA. The arbitration clause therefore does not encompass Roku's claims.

The Ninth Circuit's decision in *Johnson v. Walmart* is instructive here: there, the Ninth Circuit held that an arbitration clause in one contract did not reach a dispute under a second, separate contract between the same parties, because the two contracts were "separate, independent agreements." 57 F.4th 677, 683 (9th Cir. 2023). As the Ninth Circuit explained, even though the two contracts there "involve[d] the same parties and the same [subject]," "the arbitration agreement in the first [did] not encompass disputes arising from the second." *Id.* at 683. The same reasoning applies here: an agreement to arbitrate claims arising from development or commercialization work is not an agreement to arbitrate breaches of the Product Pricing terms in Attachment A to the MOU.

Accordingly, even if Roku could show that development or commercialization work began—and, as explained above, it cannot—Roku still could not show that its Demand for Arbitration and Statement of Claim falls within the scope of any purported agreement to arbitrate. For this independent reason as well, the Motion should be denied and the Petition dismissed.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Roku has failed to carry its burden of establishing the parties entered into a valid arbitration agreement, or that the Draft MDSA's arbitration clause would cover Roku's claim for an alleged breach of the MOU. Because arbitration is a matter of consent, Quanta respectfully requests that the Court dismiss the Motion to Compel Arbitration and the Petition to Compel Arbitration in its entirety and grant such other and further relief as the Court deems just and proper.

**K&L GATES LLP**

Dated: October 22, 2026

By: ______________________________

Kevin S. Asfour
Matthew J. Weldon (*pro hac vice*)
Lauren E. Elvick

Attorneys for Respondent Quanta Computer, Inc.